WINSLOW (THATCHER v.). See Case No. 13.863.

WINSLOW (TROY IRON & NAIL FACTORY v.). See Case No. 14,199.

WINSLOW (UNITED STATES v.). See Cases Nos. 16,741 and 16,742.

WINSLOW, The R. G. See Case No. 11,736.

## Case No. 17,883.

WINSO et al. v. The CORNELIUS GRINNELL.

[26 Law Reporter, 677.]

District Court, S. D. New York. June Term, 1864.

WHAT ARE SALVAGE SERVICES — COMPENSATION — DAMAGE TO SALVING VESSEL.

[1. Where a steamer found a sailing vessel anchored among the shoals off Cape May, in ignorance of her true position, and in considerable danger of being driven upon the banks in case her cables should part, and, after attempting, without success, to get a hawser from her, led the way safely out to sea, the sailing vessel proceeding, however, under her own sails, held, that this was a salvage service for which a liberal compensation should be awarded.]

[2. Where a steamer bound from Philadelphia to Boston was delayed several hours off Cape May by rendering a salvage service, and in consequence thereof arrived at Pollock Rip nearly at low water, and struck in going over, and received severe injuries, held, that the same were merely remote and consequential damages, which could not be recovered against the vessel to which the services had been rendered.]

[3. Five thousand dollars awarded to a steamer worth, with her cargo, $500,000, for piloting out to sea without any considerable danger to herself a sailing vessel worth $122,500, from a position of considerable peril among the shoals off Cape May.]

[This was a libel by Henry Winso and others, owners of the steamship Saxon, against the ship Cornelius Grinnell, to recover compensation for salvage services.]

SHIPMAN, District Judge. This is a libel for salvage, brought by the owners of the steamship Saxon against the sailing ship Cornelius Grinnell, for services rendered to the latter by the Saxon, near Five Fathom Bank, to the eastward of Cape May, on the 3d of April, 1863. Two questions are raised on the pleadings and proofs: (1) Whether the services rendered come within the rule of compensation applicable to salvage rewards; and (2) if so, what amount should be allowed.

The peculiar character of the case will be best presented by a somewhat detailed statement of the facts which appear proved by the evidence. The New York and London packet ship Cornelius Grinnell, of New York, valued for the purposes of this case at not less than $22,500, having on board a cargo of the value of at least $100,000, with a large number of passengers and a full crew, left London for New York on the 13th of March, 1863. On Saturday, the 2d of April, at about 10 o'clock a. m., she hove to in a severe gale of wind, her master supposing that he was off Fire Island, south of Long Island. The ship lay to till the next morning at 4 o'clock, her head being kept east southeast, the gale continuing severe. After 4 o'clock she was run in west southwest, as it was then supposed, towards New York. Between 12 and 1 o'clock she made land, which

was then thought to be the New Jersey shore. She was then headed off east southeast, and in half or three quarters of an hour struck in shoal water. She then wore ship to the westward, and immediately anchored in five and a half fathoms of water. She lay here, with her head to the wind, which was blowing fresh from the northeast, accompanied with rain, for about an hour, her officers being ignorant of their real position, when the steamship Saxon, owned by the libellants, and running regularly between Philadelphia and Boston, was discovered passing on her trip to Boston. The captain of the Grinnell immediately set signals of distress, and the Saxon bore down for him. When within hailing distance, Captain Spencer, of the Grinnell, inquired of the master of the Saxon if he could tell him where he was. The latter replied that he was on Five Fathom Bank, off Cape May. Captain Spencer then told him that he had struck on a shoal, had a considerable number of passengers on board, and asked him if he would take him to a port of safety. Captain Matthews of the Saxon replied that he would try. Thereupon, after the proper orders, the Grinnell's cable was slipped, and the Saxon took a hawser from her for the purpose of taking her in tow. In attempting to get the ship off before the wind, under her jib and foretopsail, the hawser broke from inevitable accident, and without fault on the part of either ship. The hawser parted near the Grinnell's knight heads, and, though every effort was made to haul it in on the steamer, it got foul of her screw, though her engines were stopped as soon as they could be. Some twenty or thirty fathoms of it were found on the screw after she reached Boston. After the hawser parted, the captain of the Saxon ordered the Grinnell to make sail and follow him. which was done, the two ships steering towards the mouth of Delaware Bay. After sailing five or six miles the steamer stopped her engines to let the Grinnell come up, when Captain Matthews told the master of the Grinnell that he should have to get another hawser to him before night, as it would be ebb tide before they reached the mouth of the bay, and he could not get him to a safe anchorage without it. Captain Spencer then asked him if he could not take him to sea. The captain of the Saxon said he could, and thereupon the steamer led the way, and the Grinnell followed out to sea clear of all shoals, when the Grinnell, on notice from the captain of the Saxon that she was all clear, hauled up on her course for New York. The Saxon went on her way to Boston. The ships parted about 8 o'clock, Sunday evening, April 3, having been together about five hours. When the Grinnell arrived in New York she was found to be in good condition, no damage having been suffered in the gale. While getting the hawser fast, the sea running high, the Grinnell in pitching, as the

Saxon came across her bow, came down on her, staving the boat of the latter, carrying away her rail, and cutting a hole in her deck. This damage to the Saxon was repaired for $260. Beyond this, and the winding of the hawser about the screw, the Saxon received no injury while engaged in rendering assistance to the Grinnell. Before her arrival at Boston, however, she suffered serious injury, to repair which, including loss for her detention during the repairs, cost her owners more than $25,000. The weather continued stormy after she left the Grinnell, and, the evening of the day after, she encountered a heavy gale. She kept her best steam on, and arrived at Pollock Rip, in her usual route, at about 5 o'clock Tuesday morning, about an hour before dead low water. In attempting to cross the Rip, the steamer struck, and was very badly injured, and had to be towed to Boston. Had she not been detained by the services she rendered the Grinnell, she would undoubtedly have reached the Rip at about high water, and passed over it in safety. The Saxon was a valuable steamer, worth over $100,000, and had a cargo on board valued at $400,000. To the south and west of Five Fathom Bank, where the Grinnell lay, are shoals, some of which are said not to be laid down on the charts, and as the wind and current were moving in a southwesterly direction, if the Grinnell had parted her chains, she would have been in considerable danger of being wrecked, especially if the gale had increased to a point of great severity. In case of such increase of the gale, she would have been in some danger of parting her cable had she not been rescued. The Saxon was the only regular steam packet which was due at that point about that time, though government transports occasionally passed up and down the coast in that vicinity.

Upon these facts the two questions already referred to arise, which have been elaborately discussed by counsel, and they are, obviously, as heretofore stated: (1) Were the services rendered by the Saxon to the Grinnell salvage services, and therefore entitled to salvage compensation? (2) If they were salvage services, what compensation is the Saxon entitled to?

Upon the first point, the court is satisfied that the service rendered was in the nature of salvage. The Grinnell was saved by the timely interposition of the Saxon, from a position of considerable peril. She was at anchor in the neighborhood of dangerous shoals, upon which there was at least some danger of her drifting, in the event of the parting of her cables. One severe gale had just been encountered, which had driven her into the position of danger where she then lay; and though this storm had lulled, it was not entirely over. The sea was high and the wind fresh; and another severe gale visited the coast within a few hours after

she was taken out to sea by the Saxon. The evidence is not entirely clear as to the degree of severity of the succeeding gale at Five Fathom Bank, but, judging from the ordinary range of such storms, it is fair to conclude, from the evidence, that it was felt in considerable violence at this point. It is true the Grinnell might have rode out this gale, but the captain was ignorant of his position, and the pilots who cruise the waters in that vicinity were thirty miles away at Delaware breakwater, and not likely to reach the neighborhood of Five Fathom Bank in such weather. No one can certainly determine whether or not she would have ridden out the gale in safety; and though Captain Spencer thinks she would, as her ground tackle was strong, still it must be conceded that there was more or less danger in her lying there and trusting to the experiment. It is quite evident that Captain Spencer considered his ship in great danger, and was therefore anxious that the Saxon should take him to a port of safety. It is true that he now says his fears at that time were based upon the supposition that his ship was leaking badly, which turned out to be an error. Still, I think it is clear that the ship was in real and unusual danger, independent of the fact whether she was leaking badly or not. The services of the Saxon were, therefore, in the judgment of the court, salvage services, and come entirely within the rule laid down by Dr. Lushington in the case of The Charlotte, 3 W. Rob. Adm. 71, where he says: "According to the principles which are recognized in this court in questions of this description, all services rendered at sea to a vessel in danger or distress are salvage services. It is not necessary, I conceive, that the distress should be actual or immediate, or that the danger should be imminent and absolute. It will be sufficient if, at the time the assistance is rendered, the ship has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered." This doctrine is accepted and enforced by the admiralty courts in this country. Mr. Justice Curtis, in the case of Hennesy v. The Versailles [Case No. 6,365], gives a brief and clear definition of salvage: "The relief of property," he remarks, "from impending peril of the sea, by voluntary exertions of those who are under no legal obligations to render assistance, and the consequent ultimate safety of the property, constitutes a technical case of salvage." Many other authorities to the same effect might be cited, and in view of the general rule, when considered with reference to the particular cases from which it has been deduced, I cannot doubt but that the present case is covered by it.

It only remains to consider the amount of compensation to be awarded. We are met on the threshold of this branch of the case with the claim that the court, in fixing the amount to be awarded, should consider the damage suffered by the Saxon in striking on Pollock Rip. It is not claimed that the entire amount of this damage should be included in the award, but it is insisted that the Saxon, by the delay of five hours while aiding the Grinnell, arrived at Pollock Rip so much later, and at low water, by which her risk in crossing was increased, and in consequence of which she met with the accident, and suffered great damage. And it is clear that the Saxon would have arrived at the Rip at high water, and therefore, in all probability, have passed over in safety, had it not been for her delay in aiding the Grinnell. In a certain popular and remote sense, when she undertook to get the Grinnell out of danger at Five Fathom Bank, she incurred whatever risks such a delay might subject her to. She took the risk of encountering another storm, which she might escape if she avoided the delay. Whatever increased dangers might arise during the time which her detention in this salvage service at Five Fathom Bank might prolong her voyage were all in one sense hazarded by her in staying by the Grinnell. But these remote and uncertain dangers do not, in the eye of the law, enhance her merit, and thus increase her reward. Though she had been totally wrecked by another gale, which she would have wholly escaped but for her delay of five hours in this service, I apprehend that such a disaster could not be allowed to enhance the salvage compensation. All such dangers were contingent, and the damages which might result from them must be considered in the language of the law, as remote, having no logical or legal connection with the transaction upon which the libel is founded.

We come, then, to the simple question of the amount of compensation due the Saxon for the services rendered at Five Fathom Bank. The elements to be considered in solving this question are well understood. The only difficulty is as to their application. The general rule as to compensation is that it should be liberal. In determining what is liberal we are to consider "the value of the property saved, the degree of the peril from which it was delivered, the risk of the property, and especially of the persons of the salvors, the severity and duration of their labor, the promptness of their interposition, and the skill exhibited." The Versailles [Case No. 6,365].

So far as the value of the property saved is concerned, it was considerable; it is admitted, for the purposes of this case, to be $22,500 for the ship, and $100,000 for the cargo. As to the degree of peril from which the ship and cargo were delivered, it is more difficult to determine. It was sufficient to constitute a case of salvage, but was not that imminent peril which often menaces the certain destruction of vessels on a lee shore. As the wind and sea were at the time of her

rescue, she was not in a condition of great peril. To what degree the gale increased soon after her escape, that point is not clear. So far as the risk of the property or persons of the salvors is concerned, there is no unusual ground of merit. There was, comparatively, very little risk to either. The labors of the salvors were neither severe nor long, and though their services were promptly rendered, there was nothing in the exigencies of the case to call for very great skill. On the whole, I think I shall be following the spirit of the rule which calls for liberal rewards in salvage cases, by adjudging five thousand dollars as the proper sum. Had it not been for the untoward disaster at Pollock Rip, I think the salvors themselves would have regarded this as a liberal reward. To this sum, however, I will add two hundred and sixty dollars, the amount of the damage which Captain Matthews stated that the Saxon suffered by being struck by the Grinnell.

Let a decree be entered for the libellants for the sum of five thousand two hundred and sixty dollars, with costs.